OPINION
On September 16, 1997, John Davenport was driving his car on James McGee Boulevard in Dayton when Mark Watkins pulled his truck out in front of him causing a collision. Davenport was traveling at thirty-five miles an hour at the time of the accident.
On September 10, 1999, Davenport filed a complaint against Watkins and his employer Miami Cigar and Tobacco Company alleging that Watkins' negligence caused him to suffer personal injury, medical expenses, pain and suffering, and loss of income. Davenport's spouse, Lenora, sought damages from Watkins for loss of consortium. The matter proceeded to trial on January 2001 and the jury awarded Watkins $1350 for pain and suffering, $258.75 for lost wages, and $517.05 for medical expenses. Davenport timely appealed.
Davenport was working as a plumber at Trotwood Heating and Plumbing at the time of the accident. He was 53 years of age at the time of the accident. Davenport had been married to Lenora for over thirty years and they had three children who are now adults. John purchased several properties over the years and with the help of his son who was also a plumber they rehabilitated the properties and rented them. John testified at the trial that prior to the accident he had been in good health except for occasional bouts with kidney stones.
At the trial Davenport described the accident for the jury. He described how he tried to avoid the collision by jamming his foot on the brake but he couldn't avoid the defendant's truck. He said he was wearing a seat belt but that "the motion of the impact, it twisted my back." (Tr. 185). Davenport said he sat in his truck for a little while after the collision and then got out of the truck on the passenger side as the driver's door was jammed. He said he got in the defendant's truck to await the police. He said Watkins asked him if he was all right and he replied "I don't think I'm hurt but I feel tingling down my legs. I really think it's just that I'm nervous because of the accident." (Tr. 187).
Davenport said the damage to his truck was primarily to the left front. He said the police took nearly an hour to arrive and he told the police he did not think he had been injured. (Tr. 188). Davenport said his truck was towed from the scene and he called his son to drive him back to work. After arriving at his employer's he decided he probably should go home, which he did. Davenport said the tingling in his legs got worse later in the afternoon and his wife took him to Greene Memorial Hospital Emergency Room. Davenport said the doctor examined him at the emergency room and gave him Motrin and a muscle relaxer. Greene Memorial Hospital records confirm that Davenport complained of mid-low back pain and that he felt some weakness in his lower extremities and tingling in his back. The emergency room physician gave a diagnosis of acute lumbar strain and discharged Davenport.
Davenport said he went to work the next day but began having problems with his back and right leg. He said he experienced numbness in his right foot. (Tr. 195). Davenport said he went to an Urgent Care facility and the doctor took an x-ray and told him to continue with the medication he received from the hospital. That physician also gave a diagnosis of Davenport's condition as acute lumbar strain. Davenport said his condition did not improve and he went to see Dr. Manoj Desai in mid-October. Dr. Desai referred Davenport for an MRI at Miami Valley Hospital in late October and the examining physician concluded that Davenport suffered from multilevel lumbar spondylosis.
Desai saw Davenport again in January 1998 and noted that Davenport was still having a lot of pain in his back, but no tingling or weakness in his lower extremities. Desai referred Davenport to a Dr. Philip Minella, a neurologist. Minella examined Davenport and reviewed Davenport's MRI. He could find no objective findings on the MRI and he concluded that Davenport had lumbar spondylosis. He recommended that Davenport engage in physical therapy and exercise. Davenport then underwent physical therapy twice a week at Greene Memorial and appeared to improve. He continued taking pain medication however. (Tr. 209). Davenport stated his condition continued to deteriorate and he eventually stopped working at Trotwood Plumbing on September 4, 1998 his 54th birthday. (Tr. 224).
In June 1998, Davenport was seen by Dr. Thomas Goodall, D.O. a neurosurgeon. Goodall examined Davenport and concluded he had suffered a lumbar strain with lumbar radiculopathy. In July 1998, Davenport had EMG studies performed by Dr. Pani Akuthota M.D. The doctor concluded that his findings suggested chronic right L-4 radiculopathy. In December 1998, Davenport underwent a C.T. myelogram and Dr. Michael Caccamo, D.O. noted a diffuse disc bulge at L 4-L 5 minimally effacing the nerve root at that level.
Dr. Clark Porter, M.D., a physical medicine specialist, testified that he examined Mr. Davenport in February 1999 at Dr. Thomas Goodall's request. He said Davenport related that he had more than a year's trouble with back and lower limb pain and also difficulty carrying out daily activities. Porter said he reviewed Davenport's medical history and concluded that Davenport suffered a lumbar radiculopathy as a result of the accident of September 1997. Porter said a lumbar radiculopathy is a nerve root irritation in the lumbar spine and he concluded Davenport's injury was a permanent one. (Tr. 321).
Porter said he reviewed the EMG report of Dr. Akuthota. He said the EMG report was consistent with his diagnosis of Davenport's medical problem. (Tr. 330). Porter testified he prescribed lumbar traction therapy with another regimen of physical therapy for Davenport. Porter said Davenport's symptoms were symptomatic of nerve damage rather than the mere stiffness which results from arthritis.
Porter said he would not change his opinion because Davenport initially told the defendant and the police he thought he suffered no injury. He said the body has to respond to injury with inflammation to aggravate a nerve. (Tr. 335). He said his diagnosis was not inconsistent with the x-ray report or the MRI. (Tr. 340).
On cross-examination, Porter admitted that his notes of his interview with Davenport reveal that Davenport told him that he was injured on his job on October 13, 1997 during routine physical exertion. (Tr. 346). He also conceded that one can have a radiculopathy from on-the-job exertion. (Tr. 348). Porter also conceded that lumbar spondyloses (or bone spurring in the lumbar region) which is an arthritic condition is a common cause of radiculopathy. (Tr. 353). Porter also conceded that Davenport's MRI revealed spondyloses in Davenport's lower spine. (Tr. 355).
Dr. Porter said he corrected the initial documentation error in Davenport's history and his working diagnosis was that Davenport suffered a post-traumatic radiculopathy. (Tr. 360). In any event, he said he wasn't concerned about the cause of Davenport's condition, he was concerned about treating him. (Tr. 361). Porter said that it was his opinion that considering Davenport's arthritic spine and the stress of a sudden deceleration/acceleration type injury probably allowed enough hyper extension of the spine to pinch or injure the nerve root of Davenport's spine. (Tr. 362). Porter also said he was not overly impressed with the fact that Davenport went to work the day after the accident because he frequently sees post-traumatic changes in the body take a couple of days to develop. (Tr. 383). Porter conceded however that Davenport did not demonstrate any symptoms of radiculopathy at his first visit to Dr. Desai on October 13, 1997. (Tr. 388).
Bret Ferree, M.D., an orthopedic surgeon, testified he examined Davenport at the request of defense counsel, Mary Lentz, on September 8, 1999. Dr. Ferree said he received a history from Davenport and physically examined him. He said he also examined Davenport's medical records and he concluded that Davenport may have suffered at most a mild lumbar strain in the September 1997 accident. (Tr. 502).
Ferree said that patients who suffer significant injuries to their spine notice the immediate onset of pain. (Tr. 502). Dr. Ferree also noted that it was significant that the emergency room physician noted that Davenport had good range of motion of his lower back on the night of the accident and discharged Davenport with a diagnosis of acute lumbar strain. Ferree noted that patients with more severe strains have difficulty moving their lower back. (Tr. 503). He also noted that people with more severe injury often are unable to return to work the next day.
Dr. Ferree said he examined Davenport and found no signs of spasms to muscles in his back. He said he observed that Davenport had a mild decrease in motion in his back. He noted that the strength in Davenport's leg muscles and reflexes were normal. (Tr. 499).
Dr. Ferree said that the MRI Scan showed changes consistent with arthritis and didn't show signs of acute herniation that he could attribute to the 1997 accident. He said the MRI and myelogram findings were more consistent with the wear and tear that associated with aging and certain occupations that require a lot of bending, lifting, and twisting. (Tr. 509). He said he didn't believe Davenport's degenerative arthritic condition which pre-existed the accident was aggravated or accelerated by the accident because he would have thought Davenport would have been more symptomatic after the accident. Dr. Ferree said he didn't believe Davenport suffered a permanent injury and his current symptoms relate to his arthritic condition or deteriorating discs.
On cross-examination, Dr. Ferree acknowledged that he performs a number of independent medical exams at the request of defense attorneys every year. He also stated he thought it was only a coincidence that many of Davenport's symptoms followed the accident. (Tr. 539).
In his first assignment of error Davenport contends that the trial court erred and the jury was misled by the introduction of inadmissible medical evidence. Initially Davenport contends the appellee improperly presented evidence of medical reports and opinions of medical experts who did not testify. He contends some of these medical reports contained inadmissible hearsay. Davenport refers us to several pages of the transcript without elaboration. Appellee notes that the appellant did not interpose an objection to the alleged hearsay evidence and therefore has failed to preserve any error in the admission of this evidence. We agree. Evid.R. 103(A)(1) provides that error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected and in the case of a ruling admitting evidence, a timely objection on a motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent. See, Schade v. Carnegie Body Co. (1982), 70 Ohio St.2d 207., Appellee notes that not only did appellants not object to the admissibility of the medical records, they were the parties who offered the medical records in evidence. Appellants argue that appellees continuously introduced evidence of the possibility, chance, or likelihood of a pre-existing condition. Again appellants refer us in their briefs to numerous transcript pages and again no objection was interposed by Davenport's counsel to such a line of inquiry. Dr. Porter was asked on cross-examination if radiculopathy is more likely to occur in a person who has worked hard all his life moving his lower spine and Dr. Porter conceded that was true. (Tr. 349). Dr. Porter also conceded that spondylosis or degenerative changes in one's spine as seen in Davenport's MRI are a known cause of radiculopathy. (Tr. 394). This was a proper line of inquiry upon cross-examination.
In Stinson v. England (1994), 69 Ohio St.3d 451, the Ohio Supreme Court held that expert opinion regarding a causative event, including alternative causes, must be expressed in terms of probability irrespective of whether the proponent of the evidence bears the burden of persuasion with respect to the issue. The court rejected Dr. England's contention that an expert who testifies on behalf of a defendant need not express an opinion regarding causation in terms of probability. In this case, Dr. Porter was cross-examined about other possible causes of Davenport's low back pain and numbness. The "proponent" of testimony offers such testimony only on direct or redirect examination. That was not the case here.
Davenport also argues that the jury instruction concerning proximate cause was plain error. Civ.R. 51 provides that a party may not assign as error the giving or failing to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. In this case counsel for the Davenports affirmatively assented to the trial court's instructions before and after they were read to the jury. (Tr. 559).
In the trial of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. Goldfuss v. Davidson (1997),79 Ohio St.3d 116. The trial court gave the standard instruction on proximate cause as provided in Ohio Jury Instructions. We see no error in the instruction given much less plain error.
In his second assignment, Davenport contends the defense committed plain error by its comments concerning the "McDonald's" case and other prejudicial matters. Davenport does not provide us with a specific reference to the prejudicial matter of which he complains. App.R. 16 requires that the appellant include in his brief a statement of the assignments of error presented for review, with reference to the place in the record where each error is reflected. Davenport included the page reference in his statement of facts. He refers us to pages 71-73, and 75 and 76. These page references refer to voir dire conducted by Davenport's counsel, Michael Buckwalter, not by the defense counsel as asserted in the brief.
Davenport refers us to page 609 of the transcript which covers the defense counsel's concluding remarks in the closing argument. Counsel stated the following in part:
 "I know that you are all hard-working individuals, that you all know the value of a dollar. I know that when you get to that Interrogatory that talks about pain and suffering, that you will remember that these are the same dollars that you've worked so hard for all of your lives that you're talking about. And it's easy to say fifty dollars a day for twenty-two years. Do the math.
 "Well, that's how we get the type of Verdicts that we get in the McDonald's case, because if you do the math, it's astronomical. And that's what they're asking for. It's not reality and it's not justice. And that's your job to do justice with common sense.
"Thank you."
No objection was interposed to counsel's remarks and we see no plain error present here. See, Goldfuss v. Davidson, supra.
Davenport contends the defense improperly introduced evidence of an alleged pre-existing condition which was not substantiated by a reasonable medical probability. Davenport refers us to several pages of the trial record. Nowhere in the record did Davenport's trial counsel interpose an objection to this line of inquiry. In any event, there was no dispute in this record that Davenport suffered from a pre-existing degenerative arthritic back condition at the time of the accident and that this is a common cause of radiculopathy.
Defense counsel's remarks about the McDonald's case were in response to the plaintiff's opening statement. In any event, while we believe this remark was improper we do not find that it introduced plain error into the proceedings and denied Davenport a fair trial.
Davenport also contends that defense counsel engaged in improper conduct in asking Lenora Davenport if she was asking the jury to award her money for her loss of consortium claim. Davenport's counsel objected to this line of questioning because it called for a legal conclusion. The objection was overruled by the trial court properly. Davenport has failed to cite any law that this line of questioning was inappropriate. Mrs. Davenport clearly was seeking to be compensated by the jury for her alleged loss of consortium. The second assignment of error is overruled.
In his last assignment, Davenport argues that the jury verdict was against the manifest weight of the evidence. Davenport argues that the inadequate jury award in this case indicates the jury clearly lost its way.
Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. MorrisCo. v. Foley Construction Co. (1978), 54 Ohio St.2d 279. In this case the jury heard evidence which was essentially undisputed that at the time of the accident John Davenport suffered from a degenerative arthritic condition called lumbar spondylosis. It is also undisputed that this condition commonly causes radiculopathy or lumbar nerve root injury. It is also virtually undisputed that John Davenport was asymptomatic prior to the September 1997 accident.
It is undisputed that Davenport was diagnosed with an acute lumbar strain at the Greene County Hospital Emergency Room which was confirmed the next day by another physician at an Urgent Care facility. Dr. Desai examined Davenport a month later and rendered a diagnosis of multilevel lumbar spondylosis which is a chronic degenerative condition. Desai also noted that Davenport's tingling and weakness in his lower extremities had disappeared. Dr. Minella concluded that Davenport had lumbar spondylosis also. Dr. Akuthota also concluded from his EMG studies that Davenport had a chronic right L-4 radiculopathy. The C.T. myelogram disclosed that disc bulge was minimally effacing the nerve root at L-4-L-5 of Davenport's spine.
Dr. Ferree said he reviewed all these medical reports and he said it was significant that Davenport had a good range of motion of his lower back on the night of the accident. He also noted that Davenport's strength of muscles and reflexes were normal. He also saw no sign of acute herniation and the MRI and myelogram studies were consistent with Davenport's arthritic condition, age, and occupation. The damages awarded in this case by the jury were consistent with their accepting Dr. Ferree's testimony as being the more credible. There was present in this record some credible and substantial evidence to support the jury's verdict. The third assignment of error is overruled.
In his fourth assignment, Davenport argues that the trial court erred in considering any workers' compensation claim by the Davenports. Davenport does not point to any place in the record where evidence was admitted concerning workers' compensation admitted over his objection. This assignment of error must also be overruled.
The judgment of the trial court is Affirmed.
WOLFF, P.J., and FAIN, J., concur.